IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. THOMAS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MAURICE J. THOMAS, APPELLANT.

Filed March 3, 2026.    No. A-24-873.

Appeal from the District Court for Lancaster County: MATTHEW O. MELLOR, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Matthew F. Meyerle for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

RIEDMANN, Chief Judge, and PIRTLE and FREEMAN, Judges.

FREEMAN, Judge.

I. INTRODUCTION

Maurice J. Thomas appeals from his jury convictions in the Lancaster County District Court for two counts of first degree sexual assault of a child, one count of third degree sexual assault of a child, one count of generation of child pornography, and one count of possession of child pornography. Thomas assigns the district court erred when it overruled his motion to suppress, permitted leading questions of minor witnesses, admitted evidence of prior bad acts, and imposed an excessive sentence. He further argues that the evidence was insufficient to support several of his convictions and that his trial counsel was ineffective. For the reasons stated herein, we affirm Thomas' convictions and sentences.

## II. BACKGROUND

In April 2023, law enforcement investigated Thomas in connection with a missing juvenile, a matter unrelated to the present charges. During that investigation, investigators from the Lancaster County Sheriff's Office (LCSO) executed a warrant to search Thomas' apartment and seize his cell phone.

Then, in May 2023, the Lincoln Police Department (LPD) received reports from Jasmyne G. alleging that Thomas had sexually assaulted her three minor daughters, J.G., M.L., and M.G. Thomas had known Jasmyne for 12 years and had supervised her daughters on multiple occasions. Based in part on those allegations, LCSO investigator Joanna Dimas obtained a second warrant authorizing a forensic search of Thomas' cell phone. The forensic search uncovered images and videos constituting child pornography, including material involving J.G. and M.L.

In October 2023, Thomas was charged by information with two counts of first degree sexual assault of a child, third degree sexual assault of a child, generation of child pornography, and possession of child pornography. The information alleged the offenses occurred between June 2022 and June 2023. An amended information added habitual criminal enhancements.

### 1. PROCEDURAL BACKGROUND

#### (a) Motion to Suppress

On June 13, 2024, Thomas filed a motion to suppress all evidence derived from his cell phone, arguing that the April 2023 warrant authorizing its seizure lacked probable cause. He further argued that the illegality of the April seizure rendered the June forensic search unlawful. The district court held an evidentiary hearing and received exhibits 2 through 7, which contained the following information.

On April 23, 2023, the LCSO received a report that 16-year-old E.A. had run away from her foster home. The next day, E.A.'s friend, D.S., reported receiving a Facebook messenger call at 3:30 a.m. on April 24. The call originated from E.A.'s messenger account but a male voice talked to D.S., and she heard E.A. in the background inviting D.S. to come over to an apartment. While at the apartment, D.S. recognized the voice from the phone as Thomas and observed Thomas offering cocaine and marijuana to E.A., who appeared to be staying with Thomas.

D.S. further reported that Thomas made sexual advances toward her, including attempting to grab her buttocks and stating that he "vibed" with her. D.S. explained that Thomas instructed his girlfriend, Sahara Williams, to place her hands down D.S.'s pants and stated that he "fucks with [E.A.] more than [Williams]" because Williams is "just his baby momma." D.S. reported the encounter to law enforcement out of concern for E.A.'s safety, believing that Thomas intended to engage in sexual activity with both her and E.A. Based on this information, Dimas obtained a warrant to search the apartment for E.A., evidence of drug activity, and electronic devices.

During the execution of the April 2023 warrant, LCSO investigators located E.A. inside the apartment and seized a Samsung Galaxy flip phone (Samsung) from Thomas' person, which Thomas claimed as his own. The Samsung was immediately transferred to the police property and evidence unit, logged into evidence, and secured in a Faraday container. The search of Thomas' apartment revealed both a scale and a credit card bearing Thomas' name with a white powder residue on them and a small amount of marijuana. The white powdery substance pretested positive

for cocaine and was sent to the state lab for further examination. Dimas photographed the apartment and the recovered evidence. Thomas was taken into custody.

In June 2023, Dimas obtained a second warrant authorizing a forensic search of Thomas' Samsung. The supporting affidavit incorporated the facts of the April investigation and added reports that Thomas had sexually assaulted three minors, J.G., M.L., and M.G., between 2022 and 2023. The affidavit reported that LCSO investigators conducted a "Mirandized" interview in which Thomas acknowledged that he knew E.A. was 16 years old. He stated that he had communicated with E.A. through Instagram and had invited her to the apartment. The affidavit explained, based on Dimas' training and experience, that cellular phones are commonly used to communicate with victims and store evidence of sexual exploitation.

The forensic search of the Samsung revealed a video depicting sexual penetration of J.G., a video of M.L. nude in the shower, images and videos of E.A. partially nude, child pornography, and internet search history related to child pornography. The district court denied Thomas' motion to suppress, finding both warrants were supported by probable cause.

### (b) Pretrial Hearing

Before trial, the State filed a notice of intent to use evidence of other crimes, wrongs, or acts pursuant to Neb. Reb. Stat. § 27-404 (Cum. Supp. 2024), including Thomas' alleged domestic assaults of Williams and cocaine use. The State also sought a pretrial ruling on the admissibility of video evidence recovered from Thomas' Samsung, including 244 images of child pornography. Following a pretrial hearing, the district court largely sustained the State's § 27-404 notice, finding the prior assaults and drug use inextricably intertwined with the charged offenses. The court further found the video evidence was lawfully obtained and supported by an adequate chain of custody.

### 2. TRIAL

A jury trial was held over 4 days in October 2025. At the beginning of trial, Thomas renewed his objection to the seizure and search of his Samsung, asserting the same grounds as in his motion to suppress. The district court overruled the objection and granted Thomas a standing objection based on its prior ruling on the motion to suppress.

### (a) April Seizure and June Search

The evidence at trial regarding the April 2023 seizure and the June search of the Samsung was consistent with the evidence presented at the pretrial suppression hearing. The State called LCSO Sgt. Micheal Hipps and Sgt. Casey Dahlke; Investigators Alex Kelly and Dimas; as well as property and evidence technician Dianne Campbell; and technical Investigator Tyler Loos to establish the facts surrounding the execution of both warrants. The State also called Grand Island Police Department Investigator Kathleen Brandt, formerly of the LPD during the investigation of the present case.

Brandt explained Dimas was already investigating Thomas while Brandt explored the possible child sexual assaults involving J.G. and M.L. Dimas obtained a search warrant to search the contents of Thomas' Samsung. Dimas then shared the relevant download with Brandt, who incorporated it into her investigation. The Samsung was admitted at trial as exhibit 9.

(b) Sexual Assault of J.G., M.L., and M.G.

Jasmyne, the mother to the three children, testified that Thomas had supervised her children between June 2022 and June 2023. According to Jasymne, Thomas moved out of Jasmyne's house in September 2022 and into a duplex, then relocated to his mother's apartment in March 2023. At the end of April, Thomas moved from the apartment to a hotel room.

At the time of trial, J.G. was 9 years old, M.L. was 12, and M.G. was 11. Each child identified "private parts" using an anatomical diagram, and M.G. confirmed she understood that the female sexual organ was called the vagina.

### (i) J.G.'s Testimony

Prior to J.G.'s testimony, the State requested a recess, stating that J.G. was crying in the hallway because she was scared to testify. After a short recess, J.G. took the stand. J.G. testified that when she was spending the night at Thomas' apartment, Thomas showered with her nude and inserted his penis into her vagina twice.

The State offered a video found on Thomas' Samsung depicting the assault that J.G. described. In the video dated April 21, 2023, Thomas' face appears at the beginning of the video and Thomas can be seen penetrating J.G.'s vagina with his penis. Photographs taken during the search of the apartment show a Bissel vacuum in Thomas' bathroom. This vacuum can also be seen in the video. Both Brandt and Dimas identified Thomas as the male in the video by his appearance and voice. Dimas confirmed that the bathroom in the video was the same bathroom she photographed during the April search.

### (ii) M.L.'s Testimony

M.L. described three incidents of sexual contact between her and Thomas. The first incident occurred while she and her sisters stayed the night at Thomas' duplex. M.L. stated that Williams and Thomas kissed her breasts and performed oral sex on her.

M.L. testified that the second incident occurred on or about her tenth birthday. M.L. was with Thomas at his apartment when Thomas exposed his penis to her, grabbed her hand, and made her rub his penis. M.L. explained that Thomas told her to "go down there and suck it" but she did not want to. At that time, Williams entered the room and put a condom on Thomas' penis. According to M.L., "[Williams] got on top of [Thomas] and started moving up and down." Thomas then positioned M.L.'s body above his head and performed penetrative oral sex on her.

On a third occasion, M.L. recounted going over to Thomas' apartment to clean his room. Thomas pulled M.L.'s pants down and inserted his penis into her vagina. Thomas then took his penis out and, according to M.L., "peed all over [her] legs." M.L. stated that the fluid "came out of his [penis]" and appeared yellow on a towel.

M.L. testified that she observed a white substance at Thomas' apartment, which he had "chopp[ed] . . . up with his card," and offered to her while she was lying in bed. According to M.L., Thomas yelled at her when she refused to try the white substance. M.L. also described physical altercations between Thomas and Williams where Thomas struck Williams. M.L. recalled Williams' nose bleeding and her sisters crying out of fear. M.L. collected her sisters and hid in a laundry room. Thomas later reportedly told Williams in front of M.L. and her sister, "Not to hit a man because a man would hit back."

M.L. testified that she was afraid to tell her mother about Thomas' actions, but her mother eventually asked if someone was touching her inappropriately. M.L. began to cry, and observed her mother crying, understanding that her mother knew Thomas had touched her inappropriately.

### (iii) M.G.'s Testimony

M.G. testified to one incident of sexual contact that occurred at Thomas' duplex. M.G. testified that Williams had grabbed her hand and forced her to touch Williams' vagina. M.G. recalled Williams then proceeded to touch the outer part of M.G.'s underwear over her vagina. M.G. stated that Thomas was lying in the bed next to her with his arm around her. Later that day, Thomas exposed his penis to M.G. while Williams performed oral sex on him.

M.G. further testified to witnessing a physical altercation between Thomas and Williams. M.G. recalled Thomas hitting Williams and M.L. taking her into a laundry room to hide. M.G. stated that Thomas said, "he'd knock [Williams] out." M.G. also observed a second physical fight broken up by Thomas' mother.

### (iv) Other Evidence

Jessica Blake, a pediatric sexual assault nurse examiner, testified that M.G. had told her in a child forensic interview that Thomas had touched her vagina "on the skin with his hands." M.G. reported that the touching was on the outside of her vagina, and it only occurred one time. The court received a copy of each report recorded by Blake following her forensic interviews with J.G., M.L., and M.G., respectively.

### (c) Evidence Derived From Samsung

The State presented various digital exhibits derived from Thomas' Samsung throughout trial. Exhibit 26 contains both videos and photographs of E.A. in varying stages of undress and engaging in sexual acts. Thomas can be heard speaking in the background of some of the videos. The metadata for these exhibits demonstrate that they were created between 2022 and 2023. E.A. was born in December 2006, making her no older than 16 at the time.

Exhibit 44 contained a record of the internet search history entered on Thomas' Samsung. Searches included phrases such as "lil NN modz" (little nonnude models); "NN pretweenies" (nonnude preteen girls); and "PTHC pedo" (preteen hardcore pedophilia). Thomas' Samsung also contained 57 images of child pornography, which depict the sexual penetration of children, as well as exposed genitalia or breasts. Exhibit 28 contained 244 images of children found on the Samsung, either clothed or unclothed, in highly sexual positions or wearing suggestive outfits.

### 3. Verdict and Sentencing

On October 18, 2024, the jury returned a guilty verdict on all counts of the amended information. The district court accepted the jury's verdict and found Thomas guilty. The court ordered a presentence investigation report (PSR) and scheduled sentencing.

At the sentencing hearing, the district court sentenced Thomas to 80 to 100 years' imprisonment for count 1, sexual assault of a child in the first degree; 80 to 100 years' imprisonment for count 2, sexual assault of a child in the first degree; 17 to 20 years' imprisonment for count 3, third degree sexual assault as a habitual criminal; 18 to 20 years' imprisonment for count 4, generation of child pornography as a habitual criminal; and 10 to 12 years' imprisonment

for count 5, possession of child pornography as a habitual criminal. The court ordered the sentences as to counts 1, 2, 3, 4, and 5 be served consecutively to each other and any other commitment Thomas may have been serving. The court further ordered that Thomas comply with the terms of the Nebraska Sex Offender Registration Act and granted Thomas credit for 523 days' served in custody.

Thomas appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Thomas assigns, consolidated and restated, that the district court erred in (1) denying his motion to suppress the seizure and search of his Samsung and admitting the derivative evidence at trial, (2) allowing the State to use leading questions during the testimony of J.G., M.L., and M.G., (3) admitting evidence of Thomas' prior bad acts, (4) finding the evidence sufficient to sustain his convictions, and (5) imposing an excessive sentence. Thomas also assigns that (6) his trial counsel was ineffective for (a) failing to investigate and present a defense that another person was responsible for the alleged assaults, (b) failing to object to exhibit 17 and exhibit 25, (c) failing to cross-examine J.G., M.L., and M.G., (d) failing to call Loos as a witness at the motion to suppress, and (e) failing to make a foundational objection to the admission of exhibit 28.

## IV. STANDARD OF REVIEW

When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Perry*, 318 Neb. 613, 17 N.W.3d 504 (2025). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

An appellate court reviews a trial court's allowance of leading questions for an abuse of discretion. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016), *disapproved on other grounds, State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Evid. R. 404(2), § 27-404(2), or the inextricably intertwined exception to the rule. *State v. Logan*, 320 Neb. 554, 28 N.W.3d 510 (2025).

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Dawn*, 320 Neb. 342, 27 N.W.3d 9 (2025).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Perry, supra*. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *Id.* In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Thomas assigns that the district court erred in denying his motion to suppress because the affidavit to obtain the April 2023 warrant lacked probable cause linking his Samsung to any criminal activity. He further argues that the affidavit for the second search warrant to search the contents of the Samsung failed to establish probable cause to believe evidence of a crime would be located. We conclude that the district court did not err in denying the motion to suppress.

A valid warrant authorizes law enforcement to conduct a search, overriding an individual's reasonable expectation of privacy within the scope defined by the warrant. See *State v. Neely*, 236 Neb. 527, 531-32, 462 N.W.2d 105, 107 (1990) ("Searches under the fourth amendment are unlawful only if unreasonable. A criminal search conducted pursuant to a warrant supported by probable cause is usually considered reasonable."). The Nebraska Constitution, under article I, § 7, provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." Only probable cause is contested here.

A search warrant, to be valid, must be supported by an affidavit which establishes probable cause. *State v. McGovern*, 311 Neb. 705, 974 N.W.2d 595 (2022). In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test. *Id*. The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause. *Id*.

Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found in the item to be searched. *Id*. A warrant affidavit must always set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of probable cause. *Id*. In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued. *Id*.

The nexus between the alleged crimes and the article to be searched does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found. *Id*. Probable cause may be based on common sense conclusions about human behavior, and due weight should be given to inferences by law enforcement officers based on their experience and specialized training. *Id*.

Applying these principles, the April 2023 affidavit permitted a common sense inference that Thomas' cellular phone would contain evidence of illegal activity. The affidavit detailed that E.A. used Facebook messenger to communicate with others, and when E.A.'s messenger account called D.S., a male voice later identified to be Thomas was talking to D.S., with E.A. in the background inviting D.S. to come over. The affidavit further alleged that Thomas possessed narcotics and supplied D.S. and E.A. with controlled substances, including cocaine and marijuana. D.S. reported that Thomas stated that he "fucks with [E.A.]" more than [Williams]" because Williams is "just his baby momma." Given these allegations, officers could reasonably infer that a cell phone would be used to coordinate meetings with other minors, such as E.A., and communicate with drug suppliers. Thus, the information in the affidavit provided the issuing judge a substantial basis to find probable cause that evidence would be found on Thomas' Samsung. Accordingly, the seizure under the April warrant was proper.

The June 2023 affidavit incorporated the facts used to obtain the April warrant, the results of the April search, and information learned during a post search "Mirandized" interview with Thomas. During the search, law enforcement located E.A., as well as a scale and credit card that pretested positive for cocaine. Thomas acknowledged he knew E.A. was 16 years old and that he communicated with her via Instagram to invite her over. The June affidavit also contained allegations from multiple child victims describing sexual assaults by Thomas, including conduct involving a juvenile matching E.A.'s description. It also noted that, based on Dimas' training and experience, cell phones are commonly used to store communications and recordings related to sexual offenses involving minors. These additional facts strengthened the nexus between Thomas' ongoing criminal activity and the contents of the Samsung, and due weight should be given to inferences by law enforcement officers based on their experience and training. Viewed under the totality of the circumstances, the issuing judge had a substantial basis to find probable cause to search the contents of the phone.

Because both warrants were supported by probable cause, the district court did not err in denying the motion to suppress or admitting the derivative evidence. Accordingly, we need not reach the State's alternative independent source or good faith defenses. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *State v. Adams*, 320 Neb. 316, 27 N.W.3d 23 (2025). This assignment of error fails.

## 2. LEADING QUESTIONS

Thomas next contends that the district court abused its discretion in permitting the State to elicit essential elements of the charged offenses through leading questions posed to J.G. and M.L. Thomas argues that the prosecution's leading questions went beyond what is permitted to develop child testimony. A review of the record demonstrates that the district court did not abuse its discretion in permitting leading questions.

Neb. Rev. Stat. § 27-611(3) (Reissue 2016) states that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his [or her] testimony." In general, a question is leading when it is so framed as to suggest to the witness the answer which is desired of them. *State v. Hoffmeyer*, 187 Neb. 701, 193 N.W.2d 760 (1972). Conversely, a question is not leading where it does not in any way indicate or suggest the answer desired. *Id*.

Nebraska law provides that it is usual and proper for the trial court to permit leading questions in conducting the examination of a witness who is immature, unaccustomed to court proceedings, inexperienced, terrified or embarrassed while on the stand, and unable to comprehend the questions asked. See *State v. Brown*, 220 Neb. 849, 374 N.W.2d 28 (1985) (quoting *State v. Hoffmeyer, supra*). For instance, in *State v. Burton*, 174 Neb. 457, 118 N.W.2d 502 (1962), the defendant had been charged with indecent fondling of a minor. The district court held that it was proper to allow the prosecutor to ask leading questions of two reluctant 9-year-old girls who were embarrassed about their involvement. See *id*.

Thomas challenges the leading questions which elicited testimony that he showered with J.G. and sexually penetrated her. The record reflects that J.G. was 9 years old at the time of trial, crying, reluctant to enter the courtroom, and non-responsive to nonleading questions prior to beginning her testimony. Leading questions were necessary to develop her testimony, allowing the child to identify Thomas and confirm the alleged sexual acts, similar to *Brown* and *Burton*, where leading questions were permitted to elicit testimony from distressed or inexperienced witnesses. Given the delicacy of obtaining testimony from child victims, the court acted within the scope of its discretion to permit leading questions of J.G. See Neb. Rev. Stat. § 29-1925 (Reissue 2016) (procuring and preserving testimony from child victims is delicate matter and may require special considerations).

Thomas also challenges the State's leading questions suggesting sexual acts with M.L., including: "and then [Thomas] would suck your breast and [Thomas] went down – did [Thomas] lick your vagina?" and "but your private part was on his mouth?" However, the record shows that prior to the indicated questions, M.L. had already responded to non-leading questions that Thomas had kissed M.L.'s breast and performed oral sex on her. The challenged questions were not intended to illicit any new substantive facts but to clarify M.L.'s testimony to the jury. Because the questions merely reiterated testimony, the district court did not abuse its discretion.

Thomas references M.G. in his argument but fails to assign error or argue any specific leading questions pertaining to her testimony. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025). Because Thomas failed to sufficiently assign or argue this error, we do not consider the issue.

Consequently, the district court did not abuse its discretion in permitting the use of leading questions with J.G. and M.L. This assignment fails.

### 3. ADMISSION OF PRIOR BAD ACTS EVIDENCE

In his third assignment of error, Thomas argues that the district court abused its discretion in admitting M.L.'s testimony about Thomas' alleged assaults of Williams and his drug use as inextricably intertwined with the charged offenses. Thomas claims the evidence about the assaults and drug use was presented only after M.L. had already testified about the sexual assault so did not provide context or factual setting for the crimes charged. We find no abuse of discretion.

Section 27-404(2) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. See *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025). However, rule 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. *State v.*

*Logan*, 320 Neb. 554, 28 N.W.3d 510 (2025). The Nebraska Supreme Court has explained that inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts. See *id*. Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *Id*.

Prior to trial, the State filed a notice under § 27-404(2), which the district court largely sustained. Relying on *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010), the court concluded that Thomas' threats and assaults against the victims and Williams were inextricably intertwined with the charged sexual offenses because they provided necessary context for the crimes and explained M.L.'s fear and delayed disclosure. We find no abuse of discretion. After witnessing Thomas hit Williams and draw blood, M.L. hid in a laundry room with her sisters. Later, she heard Thomas tell Williams "[n]ot to hit a man, because a man would hit back." Based on these observations, M.L. could reasonably infer that resisting Thomas would lead to physical violence.

The district court also admitted evidence of Thomas' drug use, finding it sufficiently connected to the charged conduct. M.L. testified that Thomas used cocaine in the apartment and offered it to her while she was in bed. This testimony was corroborated by physical evidence recovered from the apartment, including a scale and credit card bearing cocaine residue. Based on M.L.'s testimony, the court could reasonably infer that drugs were used to facilitate the sexual assaults. This inference is further supported by affidavits detailing that Thomas provided cocaine and marijuana to E.A., another minor with whom he had engaged in sexual acts and depicted in a sexually explicit manner. Because the testimony was inextricably intertwined with the charged crimes, we cannot say that it was clearly untenable for the district court to admit it.

### 4. SUFFICIENCY OF EVIDENCE

Thomas next assigns that the evidence was insufficient to support his convictions for first degree sexual assault of J.G., third degree sexual assault of M.G., generation of child pornography, and possession of child pornography.

### (a) First Degree Sexual Assault of a Child

Thomas first contends that the district court erred in finding there was sufficient evidence to support his conviction for first degree sexual assault of J.G. This claim is refuted by the record.

A person commits sexual assault of a child in the first degree when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). For purposes of this statute,

sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealthy, or nonlaw enforcement purposes.

- 10 -

See Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2024). The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007).

Thomas' focuses his argument on the inadequacy of J.G.'s testimony and exhibit 27. However, the evidence, when viewed in the light most favorable to the State, established that Thomas (born in 1980) sexually penetrated J.G. (born in 2015). J.G. confirmed that Thomas showered with her nude and put his penis in her vagina. The assault was captured on Thomas' Samsung and admitted as exhibit 27. In the video, dated April 21, 2023, Thomas' face is clearly visible in the first few seconds and identified by Dimas. The video occurred in the apartment bathroom in which Thomas resided when the April 2023 search warrant was executed.

Consequently, based on this evidence, any rational trier of fact could have found the essential elements of first degree sexual assault of a child beyond a reasonable doubt.

### (b) Third Degree Sexual Assault of a Child

Thomas also contends that the evidence was insufficient to support his conviction for third degree sexual assault of M.G. because M.G. did not testify that Thomas subjected her to any sexual contact. We disagree.

A person commits sexual assault of a child in the third degree if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-320.01(1) (Reissue 2016). Section 28-318(5) defines the term "sexual contact" as follows:

> Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

Viewing the evidence in the light most favorable to the State, we conclude that a rational fact finder could find that Thomas (born in 1980) subjected M.G. (born in 2013) to sexual contact. During the trial, the State introduced testimony from M.G. that indicated that Thomas was lying on the bed with his arms around M.G. while Williams touched the outside of M.G.'s underwear over her vagina. M.G. also testified that Thomas exposed his penis to her and that Williams performed oral sex on Thomas in front of M.G. While M.G. did not testify to any direct sexual contact between Thomas and herself at trial, Blake testified that M.G. told her during a medical evaluation that Thomas had touched the outside of her vagina on her skin one time. This information was also documented in exhibit 39 and offered to the jury.

From the combined evidence, a rational trier of fact could have found that Thomas subjected M.G. to sexual contact by intentionally touching the victim's sexual or intimate parts for the purpose of sexual arousal or gratification. See § 28-318(5).

### (c) Generation of Child Pornography

Thomas further asserts that there was insufficient evidence to convict him of generation of child pornography, as no witness could testify that he created the videos or images. We find the jury's verdict was supported by the evidence. We note that the State filed the generation of child pornography charge pursuant to Neb. Rev. Stat. § 28-1463.03 (Reissue 2022). That statute has since been transferred to Neb. Rev. Stat. § 28-1805 (Supp. 2025). We will review the assigned error under the law applicable at the time the charge was filed.

Section 28-1463.03 provided in relevant part:

(1) it shall be unlawful for a person to knowingly make, publish, direct, create, provide, or in any manner generate any visual depiction of sexually explicit conduct which has a child other than the defendant as one of its participants or portrayed observers; . . . (3) for a person to knowingly employ, force, authorize, induce, or otherwise cause a child to engage in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers; (4) for a parent, stepparent, legal guardian, or any person with custody and control of a child, knowing the content thereof, to consent to such child engaging in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers.

Any person who is nineteen years of age or older at the time he or she violates § 28-1463.03 shall be guilty of a Class ID felony for each offense. Neb. Rev. Stat. § 28-1463.04(2) (Reissue 2024).

The images and videos in exhibits 26 and 27 are sufficient to establish the elements of this offense. Exhibit 27 contains videos depicting J.G. and M.L. nude in the shower at the apartment on different occasions. Both are children. The video of J.G. depicts penetration, and Thomas was visually identified at the start of the video by Dimas. The video of M.L. shows M.L. in the shower with Williams and Thomas can be heard in the background of the video; his voice was identified again by Dimas.

Exhibit 26 contains videos and images of E.A., who was 16 at the time. One such image shows E.A.'s exposed breast, and another video depicts E.A. and Williams engaging in sexual fondling in the shower at the apartment. Thomas is audibly identified in these recordings as well. These exhibits, viewed together, provide evidence from which the jury could conclude that Thomas knowingly created, directed, or generated visual depiction of sexually explicit conduct of children.

### (d) Possession of Child Pornography

Thomas assigns that the evidence adduced by the State was insufficient to support his conviction for possession of child pornography. Specifically, he argues there was no testimony offered to establish when the child pornography images were downloaded or that Thomas knowingly possessed those images. The record reveals sufficient evidence. The State filed possession of child pornography charges pursuant to Neb. Rev. Stat. § 28-813.01 (Reissue 2024). That statute has since been transferred to Neb. Rev. Stat. § 28-1803 (Supp. 2025). We will rely on the statute in effect at the time the charge was filed.

Section 28-813.01 provided it shall be unlawful for a person nineteen years of age or older to knowingly possess any visual depiction of sexually explicit conduct which has a child as one of

its participants or portrayed observers. Violation of this subsection is a Class IIA felony. § 28-813.01. A person knowingly possesses child pornography in violation of this section when he or she knows of the nature or character of the material and of its presence and has dominion or control over it. See *State v. Mucia*, 292 Neb. 1, 871 N.W.2d 221 (2015).

"Possess" under this section includes constructive possession. See *State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014). Constructive possession may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same. *Id.* Moreover, where a person, using file-sharing software, intentionally searches for, downloads, views, and then deletes child pornography computer files, that person has knowingly possessed child pornography. See *Id.*

The record shows that Thomas claimed ownership over the Samsung when it was seized from his person, thus establishing dominion and control over the device. Also, as discussed above, the Samsung contained images of child erotica wherein Thomas was depicted. From Thomas' ownership of the Samsung, his demonstrated control, and the context of the contents contained therein, a rational jury could infer constructive possession of the child pornography received from the device. See *State v. Schuller, supra.*

The State also presented various exhibits from which the jury could conclude that Thomas knowingly possessed child pornography. Exhibit 28 contained approximately 244 images downloaded from the Samsung that meet the definition of child pornography; however, the State only showed the jury 40 of those photos. Exhibits 43 and 44 showed internet search terms and browsing activity related to preteen and teen sexual content originating from the Samsung. The jury was entitled to infer that the person who owned and used the phone was the person conducting these searches and storing the images.

Moreover, videos retrieved from the Samsung depicted Thomas visually and audibly participating in the sexual exploitation of children. This evidence alone strongly supports the inference of knowing possession. This evidence allowed the jury to conclude that Thomas was not merely aware of the presence of child sexual abuse material on the Samsung but was an active creator of it. This direct involvement points to both his knowledge and intent to exercise control over the elicit videos and images.

Viewed in the light most favorable to the State, the record supports a finding that Thomas knowingly possessed images of sexually explicit conduct of children within the meaning of § 28-813.01.

For the foregoing reasons, we find that the evidence was sufficient to support the guilty verdicts for first degree sexual assault of J.G., third degree sexual assault of M.G., generation of child pornography, and possession of child pornography.

### 5. EXCESSIVE SENTENCE

Thomas assigns that the district court erred in imposing excessive sentences. Thomas argues that the district court failed to consider the sentencing factors, including past trauma and mental health. Thomas also claims that the district court improperly relied on a mischaracterization of interactions with the presentence officer to conclude he was incapable of rehabilitation.

Thomas does not contest that his sentences were within the statutory limits; rather, he argues that the district court failed to consider the appropriate sentencing factors. Where a sentence

imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*.

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. We further note that a sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

The record indicates that the district court carefully considered relevant factors and did not abuse its discretion in the length of imprisonment imposed. At the sentencing hearing, the district court considered the PSR and a victim impact statement from one of Jasmyne's daughters. The State emphasized the seriousness of the offenses, their impact on the victims, and Thomas' ongoing inappropriate behavior, including sexualized conduct toward the PSR interviewer. The State noted that during the PSR interview, Thomas had stated he fantasized about the interviewer when he masturbated, asked about her marital status, and continued staring at her through a window long after the interview ended.

At the time of his sentence, Thomas was 44 years old, separated, and had six dependents. His criminal history is extensive, spanning over the course of approximately 28 years. Thomas' criminal history includes convictions for operating a motor vehicle without a license, negligent driving, manufacturing/delivery of cannabis, delivery of a controlled substance to a minor, false statements to police officers, possession of marijuana, criminal mischief, assault in the third degree, failure to appear, bad check issuance, theft by deception, escape, forgery, and other minor offenses.

In addition, for the Level of Service/Case Management Inventory assessment, Thomas scored in the very high-risk range in the domains of family/marital, companions, procriminal attitude, and antisocial patterns, and in the high-risk range in the domains of criminal history, education/employment, and leisure/recreation, and in the medium-risk range in the domain of alcohol/drug problems. Furthermore, the Sex Offender Treatment Intervention and Progress Scale assessment also assessed Thomas as a high risk to reoffend. The PSR noted that Thomas disclosed being sexually abused by relatives and their friends throughout his childhood. Thomas indicated that he was diagnosed with schizophrenia, bipolar disorder, depression, post-traumatic stress disorder, anxiety, and panic attacks. Though he is prescribed medications for these diagnoses, Thomas was not taking his medication at the time of the report.

At the sentencing hearing, the district court discussed the circumstances of the present case, noting that this offense was incomparable and nefarious. The court noted that Thomas' lack of control, especially toward women, was particularly concerning. Even more, the court found Thomas' inappropriate behavior and comments to the investigator during the PSR highly

disturbing. In its order, the court stated that Thomas was not a suitable candidate for probation, that the risk was substantial that he would engage in additional criminal conduct during any probationary period, and that a sentence of less than incarceration would depreciate the seriousness of his crime or would promote disrespect for the law.

Based upon the record before us, we find no abuse of discretion in the length of the sentence imposed. This assignment fails.

6. INEFFECTIVE ASSISTANCE OF COUNSEL

Thomas asserts that he was denied his right to effective counsel under the Sixth Amendment to the U.S. Constitution and article 1, § 11 of the Nebraska Constitution. Before addressing his specific claims, we begin with a review of the general principles governing ineffective assistance of counsel.

The Supreme Court held in *State v. Rupp*, 320 Neb. 502, 28 N.W.3d 74 (2025), that assignments of error on direct appeal regarding ineffective assistance of trial counsel must "standing alone" specifically allege what conduct constituted deficient performance. See *id*. An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*.

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id*. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

While the assigned error must specifically state the conduct claimed as deficient performance, the argument section of appellant's brief should elaborate on that assignment by discussing legal authority and its application to the trial record. See *id*. An argument that does little more than restate an assignment of error does not support the assignment, and an appellate court will not address it. *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025). Likewise, where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant has failed to include a specific argument sufficient to raise a claim. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient, and that this deficient performance actually prejudiced the defendant's defense. *State v. Vazquez*, 319 Neb. 192, 21 N.W.3d 615 (2025). To show deficient performance, the defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Kruger, supra*. Courts give counsel's acts a strong presumption of reasonableness. See *id*.

To show prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. A

- 15 -

court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either. *Id*.

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*.

During oral argument, defense counsel asserted that *State v. Rupp* was inapplicable because it was released after the parties submitted their briefs. However, we agree with the State that the level of specificity necessary on appeal was established prior to *Rupp*. See *State v. Mrza,* 302 Neb. 931, 935, 926 N.W.2d 79, 83 (2019), *disapproved on other grounds, State v. Hagens*, 320 Neb 65, 26 N.W.3d 174 (2025) ("assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance"). *State v. Rupp* did not create new law but clarified the necessary level of specificity on appeal based upon previously established case law. With the foregoing in mind, we next consider each of Thomas' claims of his trial counsel's conduct that Thomas alleges constitutes deficient performance.

### (a) Failure to Investigate Another Person

Thomas assigns that his trial counsel was deficient for failing to investigate and present a defense that another person was the person responsible for the alleged assaults. In his argument, Thomas claims he informed his counsel of an alternative suspect, a man that would stay at his mother's apartment, including during times when the victims were present. Regardless of Thomas' argument, we do not address this claim.

We find that Thomas' general assignment was not stated with the requisite level of specificity in his assigned error. Thomas' assigned error stops short of identifying the alternative suspect by name or description in the assignment. In *State v. Hagens, supra*, the Supreme Court found that "witnesses" without any further description or detail in the assignment of error was not sufficiently stated. Similarly, a claim that does not identify the alternative "person" responsible on assignment is too vague and generalized to be considered. See *State v. Kruger, supra*. Accordingly, this claim is not preserved.

### (b) Failure to Object to Exhibits 17 and 25

Thomas next assigns that trial counsel was deficient for failing to object to exhibit 17 and exhibit 25, the two search warrants. Thomas argues that counsel had no reasonable strategic basis for allowing the April and June 2023 search warrants into evidence without objection, thereby forfeiting his ability to preserve the motion to suppress for appeal.

Thomas specifically identifies the failure to object to exhibits 17 and 25 as the conduct which constituted deficient performance and argues that "counsel's failure to object . . . could constitute a failure to preserve the motion to suppress for appellate review and a waiver of the motion." Brief for appellant at 48.

At oral argument, Thomas' appellate counsel clarified that this claim is a placeholder and raised only if this court were to conclude that Thomas' challenge to his motion to suppress the April and June 2023 search warrants was not renewed or deemed waived. Stated differently,

Thomas' claim of deficient performance is expressly contingent upon a finding that Thomas' pretrial challenge to the warrants was not preserved at trial for appellate review. However, as indicated by the analysis above, this court found the objection to the April and June 2023 search warrants were preserved. Therefore, we need not address this assigned error.

### (c) Failure to Cross-Examine J.G., M.L., and M.G.

Thomas assigns that trial counsel was deficient for failing to cross-examine J.G., M.L., and M.G. He argues that this failure left testimony regarding penetration and sexual contact unchallenged and allowed the jury to credit the minors' accounts without testing their credibility. The record shows counsel was not ineffective.

When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics. *State v. Kruger, supra*. There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. *Id.* The Supreme Court maintains that we do not use perfect hindsight to second guess unsuccessful trial strategies. See *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). However, the Supreme Court has cautioned that it is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal. See *id*.

Here, after J.G.'s testimony, counsel placed on the record the questions Thomas wished to ask and explained that further cross-examination would likely not elicit helpful responses. Counsel's reasoning reflects a logical decision not to reiterate the details of the alleged assault which would risk reinforcing the State's narrative and inflaming the juries' emotions. Given the highly sensitive subject matter, the same rationale could reasonably be applied to M.L. and M.G.'s testimony.

Under *Strickland*, counsel's strategic choice is entitled to a strong presumption of reasonableness and Thomas has not overcome that presumption. See *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025). Thus, Thomas fails to establish that counsel's performance was deficient. Trial counsel was not ineffective for declining to cross-examine J.G., M.L., and M.G.

### (d) Failure to Call Loos at Suppression Hearing

Thomas assigns that trial counsel was deficient for failing to call Loos as a witness at the motion to suppress to establish that exhibit 9, the Samsung, was searched without a warrant in violation of Thomas' constitutional rights. Thomas asserts that Loos's testimony would have demonstrated that Loos searched Thomas' Samsung prior to the issuance of the court's June 2023 search warrant. The State argues this claim is refuted by the record. We agree.

The decision to call, or not to call, a particular witness, made by counsel as a matter of trial strategy, even if that choice proves unproductive, will not, without more, sustain a finding of ineffectiveness of counsel. *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025). A reasonable strategic decision to present particular evidence, or not to present particular evidence, will not, without more, sustain a finding of ineffective assistance of counsel. *Id*.

In this case, Loos testified both at a separate pretrial hearing and at trial that he retrieved the Samsung from the property unit on April 26, 2023. Initially, on direct examination, Loos explained that he received the request to search the Samsung on June 26. However, on cross-

examination, Loos clarified that he misspoke and that he did not receive the request to search the phone until June 27. The corrected testimony, as well as his later testimony at trial, extinguishes Thomas' claim that Loos would have supported his argument that the Samsung was searched prior to the issuance of the search warrant.

Under *Strickland*, the question is whether there is a reasonable probability that the suppression ruling would have been different had counsel presented the witness. See *State v. Kruger, supra*. Given that Loos's testimony, as corrected at the pretrial hearing and at trial, affirmed that no search occurred before June 27, 2023, Thomas cannot show that the omission rendered the proceeding fundamentally unfair.

Because Thomas cannot prove prejudice resulting from the failure to call Loos at the suppression hearing, this assigned error fails.

(e) Failure to Make Foundational Objection to Exhibit 28

Thomas assigns that trial counsel was deficient for failing to make a foundational objection to the admission of exhibit 28. Exhibit 28 contained child pornography images recovered from his Samsung. Thomas argues that the State presented no evidence establishing when the images were downloaded, who downloaded or viewed them, or whether Thomas knowingly possessed them. We disagree.

Neb. Rev. Stat. § 27-901 (Reissue 2016) provides that the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. But authentication or identification under this section is not a high hurdle. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). A proponent is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. *Id*. Proper authentication may also be attained by evidence of appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, sufficient to support a finding that the matter in question is what it is claimed to be. See § 27–901(2)(d).

Here, the State satisfied its burden of authentication. As discussed above, the State's evidence established that Thomas claimed ownership of the Samsung, the Samsung was seized directly from his person, and that it contained the images at issue. This evidence was sufficient to support a finding that exhibit 28 was what the State claimed it to be, specifically images recovered from Thomas' phone. Accordingly, a separate foundational objection would not have excluded exhibit 28. Defense counsel is not ineffective for failing to raise an argument that has no merit. *State v. Devers*, 313 Neb. 866, 986 N.W.2d 747 (2023).

Once the exhibit was properly admitted, the question of who downloaded the images and when became an inferential question for the jury. Similar to the context of text messages, the possibility of an alteration or misuse by another generally goes to weight, not admissibility. See *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). The Samsung was taken from Thomas and verbally confirmed to be his. The phone contained videos of child erotica that pictured him. From this context, the jury could reasonably infer that Thomas knowingly downloaded the images.

Therefore, trial counsel was not deficient for failing to object to foundation.

Thomas' assignment of error refers only to exhibit 28 and does not mention exhibit 29, although he includes exhibit 29 in his argument. To be considered by an appellate court, the party

asserting the alleged error must both specifically assign and specifically argue the error in the party's initial brief. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023). As a result, Thomas' argument for exhibit 29 is not properly assigned, and will not be considered.

Accordingly, Thomas has not established deficient performance, and this ineffective assistance claim fails.

## VI. CONCLUSION

We conclude that there is no merit to the assignments of error on appeal. Accordingly, we affirm Thomas' convictions and sentences.

AFFIRMED.